UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _6/16/21____

VICTORIA SCOTT CLARKE,

        Plaintiff,

-against-

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

19-CV-7213 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Victoria Scott Clarke filed this action pursuant to § 405(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying her application for Disability Insurance Benefits (DIB). The parties consented to the disposition of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Dkt. No. 37) and cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Plaintiff advances two principal arguments: that Administrative Law Judge (ALJ) Jan E. Dutton failed adequately to develop the medical record, and that the resulting decision was not supported by substantial evidence. The Court disagrees. For the reasons set forth in more detail below, plaintiff's motion (Dkt. No. 27) will be denied, defendant's motion (Dkt. No. 31) will be granted, and the case will be dismissed.

## I.  BACKGROUND

### A.  Procedural Background

Plaintiff filed applications for DIB and Supplemental Security Income (SSI) on March 23 and March 28, 2016, respectively, alleging disability since December 20, 2015 due to pseudotumor cerebri and a lumbo-peritoneal shunt. *See* Certified Administrative Record (Dkt. No. 24, 24-1, 24-

2) (hereinafter "R. __") at 22, 79-80, 234.[1] The Social Security Administration (SSA) denied both applications on April 26, 2016. (R. 101-08.) On May 15, 2016, plaintiff requested a hearing before an Administrative Law Judge (ALJ). (R. 109.) Plaintiff appeared before ALJ Dutton on June 5, 2018, accompanied by a non-attorney representative, Chantal Emile. (R. 45-78.)[2] Vocational expert (VE) Daniel R. McKinney also testified. (*Id*.) In a written decision (Decision) dated July 5, 2018 (R. 14-29), ALJ Dutton determined that plaintiff met the insured status requirements of the Act through December 31, 2020 but was not disabled, within the meaning of the Act, at any time from December 20, 2015 through the date of the Decision. The Appeals Council denied review on May 29, 2019, rendering ALJ Dutton's determination final. (R. 1-4.)

### B.   Personal Background

Plaintiff was born on January 8, 1988 (R. 91), and was 30 years old at the time of the Decision. She completed high school and two years of college (R. 235), earning an associate's degree in medical administration. (R. 59.) Plaintiff worked in a variety of jobs, including as a home health aide from January 2008 to December 2014 and a residential program specialist from January 2014 to December 2015. (R. 235.) She also performed seasonal work for the New York City Youth Department from 2004 to 2013. (R. 235.)

---

[1] Pseudotumor cerebri (PTC), also called idiopathic intracranial hypertension (IIH), "occurs when the pressure inside your skull (intracranial pressure) increases for no obvious reason." Mayo Clinic, *Pseudotumor Cerebri*, https://www.mayoclinic.org/diseases-conditions/pseudotumor-cerebri/symptoms-causes/syc-20354031. "Symptoms mimic those of a brain tumor. The increased intracranial pressure can cause swelling of the optic nerve," known as papilledema, "and result in vision loss." *Id*. One surgical option for treating PTC is the placement of a lumbo-peritoneal shunt, which help "drain excess cerebrospinal fluid" into the abdomen. *Id*., https://www.mayoclinic.org/diseases-conditions/pseudotumor-cerebri/diagnosis-treatment/drc-20354036. All websites cited in this Opinion and Order were last visited on June 15, 2021.

[2] Plaintiff initially appeared before ALJ Kelly Humphrey on February 21, 2018, unrepresented, but after discussion with the ALJ decided to postpone the hearing until she could appear with a representative. (R. 47-46.)

On December 20, 2015 – her alleged onset date – plaintiff went on maternity leave from her job as a residential program specialist. A few days later she gave birth to her third child. (R. 49.) At the hearing before ALJ Dutton, plaintiff testified that she was separated from her husband and lived with her three children, then aged 12, 6, and 2. (R. 54-55, 60.)

In her Function Report, dated April 11, 2016, plaintiff complained primarily of headache and shortness of breath. (R. 250-61.) She wrote that her headaches started in 2014, improved with surgery, but returned after the birth of her child and were "worse than before," sometimes preventing her from sleeping. (R. 251, 257.) Plaintiff reported that she required help from a friend to get her children ready for school, to attend to her personal grooming, and to complete her daily household chores, which included shopping, cooking, cleaning, and laundry. (R. 250-53.) Plaintiff cleaned daily (R. 259), took her daughter to school, and kept her own appointments, but no longer drove a car. (R. 253.) According to plaintiff, she could "only lift my babies' weight," could not walk for more than "5 to 10 minutes" or climb more than a flight of stairs before becoming short of breath, and sometimes forgot what she was doing when she got a headache, which happened every day, with the headaches lasting "30 minutes to 1 hour the most with meds." (R. 255, 258, 260.) For the headache pain, she took Excedrin, which worked in "15 to 20 minutes." (*Id*.) However, she wrote, her doctor was weening her off Excedrin because it contained caffeine, which raised her blood pressure. (*Id*.) Plaintiff reported that she used an inhaler for asthma (R. 261) but denied any hospitalization or emergency treatment for asthma within the past year. (*Id*.)

Plaintiff did not describe any mental health conditions or symptoms in her applications or her Function Report. (R. 250-261.) On March 30, 2016, when the SSA called her for clarification, she described her headaches and asthma but "denie[d] any psychiatric problems." (R. 84.)

3

## II.   MEDICAL EVIDENCE

### A.   Physical Impairments

#### 1.   Pre-Onset Date

On May 14, 2014, plaintiff was seen at New York Eye Surgery Associates, reporting vision problems assessed as papilledema. (R. 323-24.) A CT scan the next day showed "[l]ow lying cerebellar tonsils with crowding at the foramen magnum." (R. 321) Plaintiff was diagnosed with PTC and Chiari 1 malformation (R. 321),[3] and in July of 2014 had a lumbo-peritoneal shunt surgically placed in her back, draining into the abdomen. (R. 351, 527, 742-43.) On June 25, 2015, while pregnant, plaintiff saw obstetrician Nancy Judge, M.D., at Montefiore Medical Center (Montefiore), who noted that she was "without headache or papilledema." (R. 754.) On September 22, 2015, Montefiore neurosurgeon James T. Goodrich, M.D., who had performed the shunt surgery, wrote that plaintiff's pregnancy was going well, that she had "[n]o significant increases in the headaches," and that "her LP shunt appears to be working well." (R. 743.)[4]

#### 2.   Post-Onset Date

On February 11, 2016, approximately six weeks after delivering her child, plaintiff visited her primary care physician (PCP) at Montefiore, Joy Haeshin Kang, D.O., who noted that the patient "has ongoing HA [headaches] throughout her head constantly since delivery." (R. 343.)

---

[3] Chiari malformation "is a condition in which brain tissue extends into your spinal canal. It occurs when part of your skull is abnormally small or misshapen, pressing on your brain and forcing it downward." Mayo Clinic, *Chiari malformation*, https://www.mayoclinic.org/diseases-conditions/chiari-malformation/symptoms-causes/syc-20354010. Symptoms of a type 1 Chiari malformation "usually appear during late childhood or adulthood," including "[h]eadaches, often severe." *Id.*

[4] The shunt surgery took place approximately 18 months prior to the alleged onset date of plaintiff's disability. The administrative record does not include Dr. Goodrich's surgical report or treating notes from that procedure.

The pain was "[a]lleviated by [E]xcedrin." (*Id*.) Plaintiff's postpartum course was otherwise uneventful, and plaintiff's "last albuterol use" was "months ago." (*Id*.)[5]

On March 2, 2016, plaintiff saw Dr. Kang again, reporting continued headaches with neck pain. (R. 332.) Dr. Kang wrote that Excedrin "resolves the entire headache but [patient] needs to take it about 4 times a day." (R. 332.) Plaintiff also reported that she was using her "albuterol puff" (for asthma) "daily recently." (R. 333.) On March 3, 2016, plaintiff's headache was "still about the same." (R. 326.) On October 17, 2016, plaintiff saw allergist Elina Jerschow, M.D., complaining that her asthma was getting worse, and that she was using her albuterol inhaler "6x per week." (R. 497.) Dr. Jerschow encouraged "[F]lovent compliance." (R. 503.)[6]

On December 21, 2016, plaintiff underwent a sleep study at the Montefiore Sleep-Wake Disorders Center. (R. 515-23.) Sleep medicine specialist Renee Monderer, M.D. diagnosed severe obstructive sleep apnea (OSA). (R. 515.) Plaintiff was prescribed a bilevel positive airway pressure (BiPAP) device (R. 458), which helped her sleep better. (R. 403, 406, 411, 432, 492, 808.) She was also encouraged to lose weight and stop smoking. (R. 458.)

On January 19, 2017, during a visit with her PCP, plaintiff stated that her headache was "[s]till the same," as was her asthma, but that she was "not ready to quit smoking." (R. 460.) Dr.

---

[5] Albuterol is a quick-acting bronchodilator. Mayo Clinic, *Albuterol (Inhalation Route)*, https://www.mayoclinic.org/drugs-supplements/albuterol-inhalation-route/description/drg-20073536.

[6] Flovent (a brand name for fluticasone) is an inhalation corticosteroid, used "to help prevent the symptoms of asthma." Mayo Clinic, *Fluticasone (Inhalation Route)*, https://www.mayoclinic.org/drugs-supplements/fluticasone-inhalation-route/description/drg-20067663. "When used regularly every day, inhalation corticosteroids decrease the number and severity of asthma attacks" as well as the need for albuterol or other "rescue" drugs. *Id*.

Kang continued plaintiff on ibuprofen for the headache, added Spiriva for asthma,[7] and discussed weight-loss surgery, which plaintiff said she would consider. (R. 463.)

On February 14, 2017, plaintiff had a bariatric surgery consultation with Jillian Schreiber, M.D. (R. 482-90.) Her body mass index (BMI) at that visit was 47.07. (R. 483.)[8] Plaintiff told Dr. Schreiber that she was taking daily walks "for 30 minutes." (R. 490.) On March 6, 2017, during a visit with Dr. Kang, plaintiff stated that that she wished to proceed with bariatric surgery. (R. 400.) During the same visit, Dr. Kang noted plaintiff's "[c]hronic intractable headache," for which "no intervention" was currently ongoing. (R. 403.) Dr. Kang explained that while it could be "related to her pseudotumor, we are looking at other reasons of her HA such as OSA, etc." (*Id*.) Plaintiff's sleep apnea was "improving." (*Id*.) On March 10, 2017, she told otorhinolaryngologist Steven Y. Park, M.D. that she was "sleeping well." (R. 406.) Dr. Park determined that plaintiff was a "poor candidate" for sleep surgery "due to very high BMI," and in any event was "doing well on BiPAP." (R. 411.)

On March 21, 2017, plaintiff was evaluated by neurologists Jerry Wei, M.D., and Kathleen Mullin, M.D., at Montefiore's Headache Center. (R. 416-22.) Plaintiff reported headaches "everyday," which she described as "pressure-like and throbbing," but denied "any visual complaints," tinnitus, or "positional component to her HA." (R. 417.) Drs. Wei and Mullin diagnosed plaintiff with "[p]robable chronic migraine," despite "good pressure control" and "no

---

[7] Spiriva (a brand name for tiotropium) is a bronchodilator used to treat COPD and "as maintenance treatment for asthma." Mayo Clinic, *Tiotropium (Inhalation Route)*, https://www.mayoclinic.org/drugs-supplements/tiotropium-inhalation-route/description/drg-20066394.

[8] "Obesity is diagnosed when your body mass index (BMI) is 30 or higher." Mayo Clinic, *Obesity*, https://www.mayoclinic.org/diseases-conditions/obesity/symptoms-causes/syc-20375742.

evidence of papilledema for years now." (R. 417.) They prescribed Topamax. (R. 421.)[9] However, on May 4, 2017, plaintiff told Dr. Kang that she had stopped taking Topamax because she was "feeling drowsy." (R. 436.) At the same visit, plaintiff reported that she "[h]ad some time off" from headaches, but they had "returned." (*Id*.) She also told Dr. Kang that she "feels that her medical problem is from her weight and is committed to the surgery." (*Id*.)

In March, April and May 2017, plaintiff met with dietician Suzana Cordova for weight loss support. (R. 411, 422, 442.) At her April 11, 2017 visit, plaintiff reported that she was walking for 30 minutes twice a week and also planned to exercise in the gym for 30 minutes three times a week. (R. 426.) The only limitation she reported on her activity was "asthma." (*Id*.) Ms. Cordova's treatment notes from that visit reflect both that plaintiff was a "current everyday smoker" and that she "reports having quit smoking." (*Id*.) On April 25, 2017, plaintiff had a follow-up visit with Dr. Monderer, who fitted her with a new BiPAP mask "to improve mask leak." (R. 434.)

From October 17 through November 4, 2017, plaintiff was hospitalized with pneumonia, pleural effusion, and a left pneumothorax (collapsed lung), ultimately requiring a VATS procedure (video-assisted thoracoscopic surgery), performed by Amit Barghava, M.D. (R. 539-719.) She was discharged with a prescription for, among other things, a "safety bath and shower chair." (R. 553.)

On February 23, 2018, plaintiff underwent gastric sleeve surgery for weight loss.[10] On May 17, 2018, she saw Dr. Monderer for follow-up regarding her OSA. Dr. Monderer noted that plaintiff had lost 40 pounds, bringing her BMI down to 38, and had stopped smoking. (R. 808-

---

[9] Topamax (a brand name for topiramate) is used to treat seizures and "to help prevent migraine headaches." Mayo Clinic, *Topiramate (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/topiramate-oral-route/description/drg-20067047.

[10] The administrative record does not include the surgical or other treating notes from the gastric sleeve surgery, though the date of the procedure is noted elsewhere. (R. 809.)

810.) Although plaintiff "seem[ed] to have more apnea since the weight loss," she was "sleeping for an adequate amount of hours at night." (R. 810, 813.) Her medication list as of May 17, 2018 included asthma and allergy medications, Zoloft, Seroquel,[11] and – for headache pain – Tylenol Extra Strength. (R. 813-14.)

## B.     Psychiatric Impairments

On November 3, 2016, plaintiff visited Frederick Brandenberger, LCSW, at Montefiore's Family Health Center. (R. 504.) No earlier treatment notes from Mr. Brandenberger appear in the administrative record; however, his November 3, 2016 note reports that plaintiff had an "initial" session on June 15, 2016, and follow-up sessions on July 20, August 31, and September 22, 2016. (R. 504-506.) At each of these visits (summarized in the November 3 note) plaintiff was administered the PHQ-9 screening test for depression, scoring between 14 ("moderate depression") and 23 ("severe depression"), and the GAD-7 questionnaire for anxiety, scoring between 10 ("moderate") and 17 ("severe"). (*Id*.) During the November 3 visit, plaintiff's appearance was neat and well groomed; her manner was cooperative; her eye contact was good; her thought process was coherent and intact; and her insight, judgment, and concentration were fair. (R. 508-09.) She reported difficulties with recent memory, but did not present with suicidal or homicidal ideation,

---

[11] Zoloft (a brand name for sertraline) is an antidepressant "used to treat depression, obsessive-compulsive disorder (OCD), panic disorder, premenstrual dysphoric disorder (PMDD), posttraumatic stress disorder (PTSD), and social anxiety disorder (SAD)." Mayo Clinic, *Sertaline (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940. It is "the most commonly prescribed antidepressant (and overall psychiatric medication) with over 38 million prescriptions in 2017." Jessica Gold, *The FDA Added Zoloft to the Drug Shortage List*, Forbes (June 6, 2020), available at https://www.forbes.com/sites/jessicagold/2020/06/06/the-fda-added-zoloft-to-the-drug-shortage-list-heres-why-you-dont-need-to-worry-yet/?sh=553483e72887. Seroquel (a brand name for quetiapine), is "used alone or together with other medicines to treat bipolar disorder (depressive and manic episodes) and schizophrenia." Mayo Clinic, *Quetiapine (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/quetiapine-oral route/description/drg-20066912.

hallucinations, or delusions. (*Id.*) Her mood was anxious, and she complained of depression, anxiety, "health issues," and the loss of her sister-in-law, who died from a heart attack. (R. 504.)

On January 3 and February 6, 2017, plaintiff saw Mr. Brandenberger again, and he made similar findings on examination. (R. 453-54, 475-76.) On January 3, plaintiff's mood was euthymic (tranquil) and her affect was "appropriate and pleasant." (R.453-54.) On February 6, her mood was both "euthymic" and "irrita[bl]e," and she presented "with a congruent & full range of affect." (R. 477.) Brandenberger diagnosed major depressive disorder (moderate episode) and generalized anxiety disorder (R. 455, 477), for which plaintiff was prescribed Zoloft on December 5, 2016 by Montefiore psychiatrist Sidney Hankerson, M.D. (R. 455, 478.)

There are no further notes from Mr. Brandenberger in the administrative record. Nor do Dr. Hankerson's December 5, 2016 notes appear in the record. However, the record does include Dr. Hankerson's notes from a medication management appointment on February 10, 2017 (R. 479-82), during which plaintiff "admit[ted] to only taking Zoloft 2-3 times a week, with "no side effects," and reported that her major stressors were an "ACS [Administration for Children's Services] case opened against her" because her 5-year-old daughter was "missing school excessively," and "marital discord." (R. 479.) She denied panic attacks, hallucinations, delusions, or other psychotic symptoms. (R. 479-80.) Her "last PHQ9" score was "16 (Moderate)," noted to be a 5-point improvement from her prior score, and her "last GAD7" was "14 (Moderate)." (R. 479.) Her mental status exam was unremarkable, except that her mood was "stressed," and plaintiff reported "subjectively feeling better." (R. 480.) Dr. Hankerson continued plaintiff on Zoloft, provided "extensive psychoeducation about taking daily," and informed her that "our next appt would be our last," as plaintiff would be managed by her primary care physician or "referred out to MHC thereafter." (R. 480-81.) On March 6, 2017, plaintiff told Dr. Kang, her PCP, that she

was "taking Zoloft as prescribed" and had been referred to "NY [P]sychotherapy," with an appointment "coming up." (R. 492.)

On March 28, 2017, plaintiff was examined by psychiatrist Donn Wiedershine, M.D., at the New York Psychotherapy and Counseling Center. (R. 511-14.) Dr. Wiedershine wrote that the patient, referred to as "RT," presented with "bipolar disorder and OCD [obsessive compulsive disorder]." (R. 511.) He stated that RT was "seeing a psychiatrist monthly for a year," but had "not yet seen a therapist outside of NYPCC." (*Id*.) He wrote that RT began experiencing auditory hallucinations, visual hallucinations, and paranoia "as a child," that she had a history of "the full spectrum of manic symptoms," and that she experienced "psychotic symptoms frequently" and "in any mood," including hallucinations, paranoia, mood swings, and "mind racing," though no panic attacks. (R. 511, 513.) Dr. Wiedershine also reported that plaintiff "was involved in frequent fights growing up" and continued to be "physically aggressive" into adulthood. (R. 511.) However, he noted, there was no history of suicidal or homicidal ideation. (R. 513.) Although RT had last taken Zoloft "a week ago," and it was "ineffective" (R. 511), Dr. Wiedershine recommended that she remain on Zoloft, along with Geodon and Ambien,[12] and commence weekly therapy. (R. 514.)

On May 4, 2017, plaintiff told Dr. Kang that she "missed appt with NY Psychotherapy," but planned to attend therapy appointments in the future, and that she needed a Zoloft refill. (R.

---

[12] Geodon (a brand name for ziprasidone) is "is used to treat symptoms of psychotic (mental) disorders, such as schizophrenia, mania, or bipolar disorder. " *Ziprasidone (Oral Route)*, Mayo Clinic   https://www.mayoclinic.org/drugs-supplements/ziprasidone-oral-route/description/drg-20067144. Ambien (a brand name for zolpidem) "is used to treat insomnia (trouble sleeping). It belongs to the group of medicines called central nervous system (CNS) depressants, which slows down the nervous system." *Zolpidem (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/zolpidem-oral-route/description/drg-20061195. There is no evidence in the administrative record that plaintiff ever took Geodon or Ambien.

436.) Her PHQ-9 score that day was 17 (moderately severe) and her GAD-7 score was 18 (severe). (R. 439-40.) Dr. Kang recommended that she continue with therapy and Zoloft. (R. 441.)

No further mental health treatment notes appear in the record, although plaintiff reported in an undated medication list that she was prescribed Zoloft and Seroquel sometime in 2017 by psychiatric nurse practitioner Seth Dressekie (R. 310, *see also* R. 52), and Dr. Monderer's notes from May 17, 2018 reflect both prescriptions. (R. 812.)

### C.   Opinion Evidence

#### 1.   Dr. Torres-Acosta

On October 18, 2016, plaintiff was examined at Fedcap Rehabilitation Services, which produced a "Biopsychosocial Summary" including an evaluation of plaintiff's "work limitations" by internist Michelle Torres-Acosta, M.D. (R. 360-99.) Plaintiff reported that she had walked to the Fedcap appointment; that she normally traveled by bus; but that she is "unable [to] travel in crowds." (R.363.) She described her medical barriers to employment as "joint back pains, asthma, HTN [hypertension], headaches, leg, foot knee hand pains [and] Depression." (R. 364.) She reported that she had difficulties with walking, climbing stairs, and seeing, but no difficulties with personal grooming, shopping, cooking, eating, or housekeeping. (R. 371.)

Dr. Torres-Acosta opined that plaintiff had an emotional limitation requiring "low stress" work (R. 393), an environmental limitation on her ability to tolerate exposure to heights or machinery, and a "general" limitation related to her ability to maintain energy levels, sustain attendance, and achieve adequate work pace and productivity (R. 393-94), and wrote that plaintiff should be allowed a flexible/modified work schedule and take breaks as needed. (R. 394.) She did not identify any exertional or postural limitations. (R. 391-92.) Dr. Torres-Acosta concluded that plaintiff was temporarily unable to work for 90 days pending further evaluation of her Chiari type 1 malformation, which "might need Chiari decompression." (R. 399.)

11

## 2.   Dr. Archbald

Neurologist Cheryl Archbald, M.D. examined plaintiff at the request of the SSA on April 21, 2016 (R. 351-54), and again on November 20, 2017. (R. 527-36.)

During the 2016 examination, plaintiff told Dr. Archbald that she suffered from headaches, intermittent back pain, and "mild, intermittent asthma," which had never required hospitalization or emergency room treatment. (R. 351.) She did not describe any psychological difficulties. She reported that "she can do cooking, cleaning, laundry, and shopping," but that her activities were "[o]ccasionally" limited due to headache, and that when having a headache, she "needs assistance." (R. 352.) Plaintiff's examination was unremarkable except that she complained of knee pain, could walk on her toes and heels "with difficulty," and had a positive straight leg raising (SLR) test bilaterally at 30 degrees. (*Id*.) Her range of motion was slightly limited in her right hip and knee, and she had a "1/4 squat." (R. 353-54.) Dr. Archbald opined that plaintiff should "avoid environmental triggers for her asthma," and that she had mild limitations for kneeling on her right knee and climbing stairs; moderate limitations for squatting, lifting and carrying; and a marked limitation for "bending." (R. 354.)

During the 2017 examination – just three weeks after her VATS procedure – plaintiff told Dr. Archbald that she "had sleep apnea for two years," that she slept with a CPAP machine, and that in addition to her physical impairments she had "depression, anxiety, and bipolar disorder," for which she received mental health services. (R. 527.) She reported that since her lung surgery she used both a walker and a shower chair, and that she had "assistance with cooking, cleaning, and shopping." (R. 528.) On examination, plaintiff had a "slow guarded gait" without the walker, leading Dr. Archbald to conclude that it "appears to be medically necessary." (*Id*.) Plaintiff could walk on her toes "with difficulty," displayed a limited range of motion in the lumbar spine and the left shoulder (due to "left-sided pain" from the lung surgery), and had a "[h]alf squat." (R.

528-29.) The exam was otherwise normal, and plaintiff's SLR test was negative. (R. 529.) Dr. Archbald concluded that plaintiff should "avoid environmental irritants for asthma," and should "limit activities involving moderate exertion due to a recent lung surgery." (R. 529.) She opined that plaintiff had mild limitations with walking, squatting, and lifting and carrying with the right arm; moderate limitations for climbing stairs and lifting and carrying with the left arm; and a marked limitation for bending. (R. 529-30.)

On the same date, Dr. Archbald completed a medical source statement. (R. 531-37.)  She wrote that plaintiff could frequently lift up to ten pounds with both arms, and could occasionally lift and carry up to twenty pounds with the right arm. (R. 531.) Plaintiff could sit for up to four hours, stand for up to two hours, and walk for up to two hours in an eight-hour workday. (R. 532.) She could frequently reach overhead with the right hand, and occasionally with the left. (R. 533.) She could occasionally balance, stoop, kneel, and crouch, but never climb ladders or scaffolds, or crawl. (R. 534.) Dr. Archbald wrote that plaintiff required the use of a walker, and again opined that she should limit activities involving "moderate exertion" due to her recent lung surgery. (R. 532, 535-36.) Based on plaintiff's physical impairments, Dr. Archbald concluded that she could perform "light" shopping, travel alone, walk a block, use public transportation, climb a few steps, prepare simple meals, take care of her personal hygiene, and handle paper files. (R. 536.)

### 3.    Dr. Kang

On June 15, 2018 – after the administrative hearing – Dr. Kang submitted a letter stating that plaintiff was being evaluated for sleep apnea and "having headache related to her recent medical procedure." (R. 807.) Dr. Kang then wrote:

> Given patient's intracranial hypertension status post shunt placement, procedures increase frequency and severity of her headache limiting her function to work. Plaintiff is also receiving minimum of weekly medical appointments (sometimes every few days) limiting her opportunity to work. Thus, patient would need short-

13

term disability to support herself and her three children. The anticipated end date
for her medical evaluation and treatment for above is 6 months.

(*Id*.) No further detail was provided.

## III.   HEARING

### A.   Plaintiff's Testimony

During the June 5, 2018 hearing before ALJ Dutton, plaintiff reported that her medical
conditions were PTC, asthma, diabetes, anxiety, and sleep apnea. (R. 56-57.) She later clarified
that her diabetes was "controlled by diet," and did not require medication. (R. 63-64.) Regarding
her anxiety, plaintiff testified that she had panic attacks and "can't even get on the bus if it's too
crowded." (R. 56.) Plaintiff reported that she had stopped smoking and had lost a total of 50 pounds
since having gastric sleeve surgery in February 2018, but that it did not help with her sleep apnea,
and in fact she had to "do another sleep study." (R. 57-58.) Plaintiff told ALJ Dutton that she could
reach overhead but could not pick up a pen off the floor, "[b]ecause my back, and I have pains."
(R. 60.) She could walk two blocks, or "around the track in the park," using the walker prescribed
after her lung surgery. (R. 59-60.) She could "probably" use a cane instead. (R. 65.) She used a
shower chair to bathe. (R. 61.) Plaintiff testified that she had three to four headaches per day, which
were "really bad," but did not take any medication to treat them because, after her gastric surgery,
she could no longer take Motrin. (R. 61-64.) She acknowledged that she was also prescribed
Topamax for her headaches, but testified that she decided not to take that medicine because it was
used to treat seizures, which she did not have. (R. 64.)

Plaintiff told the ALJ that she was able to care for her children and her home with the
assistance of family members and neighbors, who helped with childcare, cooking and cleaning.
(R. 58.) She had her laundry delivered. (*Id*.) She stated that she needed disability benefits because
"my doctor wouldn't clear me to go back to work" and she could not "do the things I used to do

14

before." (R. 56.) When asked if she could do "some other type of work," plaintiff responded, "I can't even wear shoes because my feet swell," and "I have to use my walker to walk." (R. 59.) When asked if she could perform an administrative or clerical job, plaintiff said that she could not sit at the computer for long "because it bothers my eyes, and my head aches." (*Id.*)

### B.   VE Testimony

VE McKinney testified that plaintiff's past relevant work was as a Home Health Aide (DOT 354.377-014) and as a Park Worker (DOT 406.681-010), both of which were classified as "medium" work. (R. 67-68.)[13] ALJ Dutton then asked if there were any jobs that could be performed by a hypothetical claimant capable of work at the "light" exertional level[14] who could occasionally lift or carry 20 pounds; could frequently lift or carry 10 pounds; could stand, sit, or walk six hours in an eight hour day; could "occasionally do postural activities" such as climbing, balancing, stooping, kneeling, crouching, and crawling, but could not work on ladders; had to "avoid concentrated exposure to cold, heat, wetness, humidity," as well as "excessively noisy backgrounds, but could handle moderate noise"; and should "avoid even moderate exposure to fumes, odors, gasses," as well as "concentrated exposure to hazards." (R. 68-69.) The VE stated that such a person would be able to perform the work of Cashier II (DOT 211.462-010, 700,000 jobs in the national economy), Production Assembler (DOT 706.687-0101, 250,000 jobs), or Mail Clerk (DOT 209.687-026, 100,000 jobs.) (R. 69.)

---

[13] Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

[14] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

For her second hypothetical, ALJ Dutton described an otherwise similar claimant who could only walk or sit for up to four hours in an eight-hour day, and who would need "a sit-stand option," that is, the ability "to change position periodically due to pain or discomfort." (R. 70.) The VE testified that the same jobs would be available but there would be erosion in the number of such jobs that such a claimant could perform, to 175,000 for Cashier II, 100,000 for Production Assembler, and 50,000 for Mail Clerk. (R. 70.)

After some colloquy with plaintiff's representative, the ALJ asked VE McKinney whether any of the jobs he identified could be performed by a claimant who could not stand or walk more than two hours in an eight-hour day. (R. 72.) He testified that the Cashier II job "could still be done," and identified three additional jobs that could be performed by the hypothetical claimant at the "sedentary" level: Order Clerk (DOT 209.567-014, 40,000 jobs); Charge Account Clerk (DOT 205.367-014, 45,000 jobs) and Bench Hand (DOT 700.687-062, 25,000 jobs). (R. 73.)[15]

Finally, plaintiff's representative, Ms. Emile, asked whether any work would be available for the same hypothetical claimant if she were off-task 15 to 20 percent of the working day or absent two to three times per month. (R. 74.) VE McKinney responded that such a person would not be able to maintain competitive employment. (R. 74-75.)

### C.   Discussion Regarding Development of the Record

At the beginning of the hearing, ALJ Dutton asked plaintiff's representative to obtain and submit the medical records covering plaintiff's hospitalization for bariatric surgery in 2018. (R.

---

[15] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

50-51.) Ms. Emile said she would do so, adding that the hearing should proceed because "we have enough information." (R. 51.) The ALJ then advised that she had no psychotherapy records after June of 2017. (*Id.*)[16] Ms. Emile stated, "Okay, that's basically all. If you need anything after that, we would have to quest for it." (R. 52.) The ALJ noted that the SSA "did not find a mental impairment" at the administrative level but invited plaintiff to "submit it" if "you think that's relevant." (*Id.*) Ms. Emile responded that she "agreed" with the administrative determination "in a sense, because her medication is working. The main problem for her not being able to work is the medical condition." (*Id.*)

After the close of the testimony, ALJ Dutton invited Ms. Emile to "get ahold of [plaintiff's] doctors and see if any of them say she needs to use a walker, [whether] that's a permanent restriction." (R. 75.) Noting that the record did not contain any opinion from plaintiff's treating PCP, she also asked for "an opinion from her treating doctor," and "anything else that bolsters your case." (*Id.*) She suggested that plaintiff obtain a statement from Dr. Kang "about any permanent restrictions" (R. 76) and "[s]ee if Dr. K[ang] will give a permanent restriction for anything." (R. 77.) Ms. Emile undertook to do so within two weeks. Before closing the hearing, the ALJ emphasized again that plaintiff would "have to have the doctor explain anything that's a permanent type of restriction." (*Id.*)

Thereafter, plaintiff submitted Dr. Kang's June 15, 2018 letter, which – as noted above – stated that plaintiff was undergoing "extensive evaluation for sleep apnea," with an "anticipated end date" in six months, but did not discuss any specific functional restrictions, much less identify

---

[16] In fact, as plaintiff correctly points out, Pl. Mem. at 11, there are no psychotherapy treating notes in the administrative record after March 28, 2017, when plaintiff saw Dr. Wiedershine. (R. 511-12.)

any permanent restrictions that could keep plaintiff from working. (R. 807.) Plaintiff did not submit any additional psychotherapy treatment records, nor the records from her bariatric surgery.

## IV.   THE ALJ'S DECISION

### A.   Standards

A claimant is "disabled," and therefore eligible for benefits under the Act, if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairments must be "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In her July 5, 2018 Decision, the ALJ correctly set out the five-step sequential evaluation process used pursuant to 20 C.F.R. §§ 404.1520(a) and 416.920(a) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. (R. 14-15.) The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant bears the burden of proof as to the first four steps; the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). To support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform given her residual functional capacity (RFC), age, education, and relevant work experience. *See* 20 C.F.R. §§ 404.1512(b)(3), 404.1560(c), 416.912(b)(3), 416.960(c). In this Circuit, "the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

Prior to steps four and five, the ALJ must determine the claimant's RFC, based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 404.1520(a), 404.1545(a)(3), 416.920(a), 416.945(a)(3). For claims filed before March 27, 2017, the ALJ must weigh the medical opinion evidence in the record in accordance with the standards set out in 20 C.F.R. §§ 404.1527(c) and 416.927(c).

### B.    Application of Standards

The ALJ found that plaintiff met the insured status requirements of the Act through December 31, 2020. (R. 17.)

At step one, the ALJ found the plaintiff had not engaged in substantial gainful activity since December 20, 2015, the alleged onset date of her disability. (R. 15.)

At step two, the ALJ found the plaintiff had the following severe impairments: "headaches, benign pseudotumor cerebri, chiari type 1, history of lumboperitoneal shunt placed in July 2014, asthma, obstructive sleep apnea, and obesity." (R. 17.) She noted plaintiff's mental impairments of major depressive disorder, generalized anxiety disorder, and bipolar I disorder but, after considering the degree of limitation resulting from these impairments in each of the four broad functional areas set forth in 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3) (and in paragraph "B" of the Listings for these disorders, *see* 20 C.F.R. part 404, subpart P, App. 1, §§ 12.00(A)(2)(b)), 12.04, 12.06), concluded that these conditions resulted in no more than "mild" limitations in any of the relevant functional areas and therefore were "non-severe." (R. 19-20.)[17]

At step three, the ALJ found the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any Listing. (R. 20.)

Before proceeding to step four, the ALJ determined that plaintiff had:

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) but with additional limitations. She can lift and carry up to 20 pounds occasionally and 10 pounds frequently. She can stand and walk up to four hours of an eight-hour workday and sit four hours in an eight-hour workday, but she would need a sit-stand opinion, that is to change position periodically due to pain or discomfort. She can occasionally do postural activities such as climbing, balancing, stooping, kneeling, crouching, and crawling. She can perform no work on ladders. She must avoid concentrated exposure to cold, heat, wetness, humidity and hazards. She must avoid excessively noisy backgrounds, but can handle moderate noise. She must avoid even moderate exposure to fumes, odors, and gases.

(R. 22.)

In the course of determining plaintiff's RFC, the ALJ noted that some of plaintiff's statements about the severity of her symptoms were "inconsistent with the medical evidence of

---

[17] Specifically, the ALJ found that plaintiff had mild limitations in understanding, remembering, or applying information; no limitations in interacting with others; mild limitations in concentrating, persisting, or maintaining pace; and no limitations in adapting or managing herself. (R. 19-20.)

record." (R. 22.) For example, plaintiff testified that she was no longer taking any medication for her headaches, having stopped Motrin because of her gastric surgery and stopped Topamax because she did not have seizures. "If the claimants' headaches were as severe as alleged," the ALJ reasoned, "it is reasonable to assume that [she] would seek out a different treatment or medication to deal with the alleged extreme pain." (R. 23.) Plaintiff was pursuing treatment for her sleep apnea; however, the ALJ noted, as recently as May 2018 she "was sleeping for an adequate amount of hours at night," and her compliance reports "showed only mild persistent apnea." (*Id*.) Similarly, although plaintiff's asthma was characterized as "moderate and persistent" on January 19, 2017, when she was still smoking (R. 24), she had never required emergent treatment or hospitalization for asthma symptoms. (*Id*.) And although plaintiff claimed at the hearing that she still required the walker that was prescribed six months earlier, after her VATS procedure, the ALJ found "nothing in the medical evidence" to indicate that she needed it more than briefly after the surgery. (R. 25.) The ALJ further reasoned that the fact that plaintiff was able to cook, clean, care for her three children, and shop – albeit with assistance – was "inconsistent with her complaints of disabling symptoms and limitations." (*Id*.)

In considering the medical opinions in the record, ALJ Dutton gave "little" weight to Dr. Kang's June 15, 2018 letter, because it did not "address any long-term functional restrictions" or "provide specific limitations regarding the claimant's functioning." (R. 26.) She gave "partial" weight to Dr. Archbald's opinions, rejecting the consultative examiner's conclusion that plaintiff had marked limitations in bending as "not supported by the record as a whole" and disregarding her 2017 opinion as to plaintiff's limitations with walking because it was rendered "within one month of plaintiff's lung surgery." (*Id*.) The ALJ gave "little" weight to the opinion of Dr. Torres-

Acosta – that plaintiff would need a low-stress environment with the ability to take breaks as needed – as inconsistent with the record as a whole. (R. 27.)

At step four, the ALJ found that plaintiff was "unable to perform any past relevant work." (R. 27.) Finally, at step five, the ALJ found, based on the testimony of the VE, that there were "jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 29.) The ALJ therefore found that plaintiff had "not been under a disability, as defined in the Social Security Act, from December 20, 2015" through the date of the Decision. (R. 29.)

## V.    ANALYSIS

Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). To prevail on such a motion, a party must establish that no material facts are in dispute and that she is entitled to judgment as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988); *Claudio v. Commissioner of Social Security*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017). The law governing Rule 12(c) motions in cases such as this is clear. The reviewing court "may set aside an ALJ's decision only where it is based upon legal error or where its factual findings are not supported by substantial evidence." *McClean v. Astrue*, 650 F. Supp. 2d 223, 226 (E.D.N.Y. 2009) (citing *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, the district court must first decide whether the Commissioner applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1970)). "In

determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Longbardi*, 2009 WL 50140, at *21 (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999); *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than one interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks and citation omitted). The same standard applies to "inferences and conclusions drawn from such facts," *Williams v. Colvin*, 2015 WL 1223789, at *7 (S.D.N.Y. Mar. 17, 2015), which the reviewing court is obligated to accept if supported by substantial evidence. *Id*.; *accord*, *Marchand v. Sullivan*, 1991 WL 183355, at *2 (S.D.N.Y. Sept. 11, 1991). Thus, the substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Id.* (citation omitted); *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

In this case, plaintiff contends that the ALJ failed adequately to develop the record as to her mental and physical impairments, and therefore that the ALJ's RFC formulation was not supported by substantial evidence. Pl. Mem. (Dkt. No. 28) at 15-22. Plaintiff further contends that even assuming an adequate record, the ALJ's RFC formulation did not consider all her documented limitations, and for that reason as well, the ALJ's RFC formulation was not supported by substantial evidence. *Id*. at 23-25. Plaintiff takes particular exception to the treatment of her mental health problems, arguing that the ALJ erred at step two in finding that her depression, anxiety, and

bipolar I disorder were "non-severe," *id.* at 12, and her headaches, arguing that the ALJ failed to account for her "sensitivity to light." *Id.* at 25. The Commissioner argues that the ALJ properly developed the record and that her determinations were supported by substantial evidence. Def. Mem. (Dkt. No. 32) at 16-24.

### A.      The ALJ Satisfied Her Duty to Develop the Record

"Whether the ALJ has met [her] duty to develop the record is a threshold question" which the Court must determine "[b]efore reviewing whether the Commissioner's final decision is supported by substantial evidence." *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 261 (S.D.N.Y. 2016). "[T]he social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citations omitted).

The applicable regulations require the agency to develop the claimant's "complete medical history for at least the 12 months preceding the month in which [she] file[s] [her] application," and make "every reasonable effort" to help her obtain records from her treating sources. 20 C.F.R. § 404.1512(b)(1). In addition, "the ALJ must 'make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of the treating physician as to the existence, the nature, and the severity of the claimed disability.'" *Hooper v. Colvin*, 199 F. Supp. 3d 796, 812 (S.D.N.Y. 2016) (quoting *Molina v. Barnhart*, 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005)). The ALJ may also "order a consultative examination," 20 C.F.R. § 404.1512(b)(2), which – even in the absence of a treating physician's opinion – can furnish substantial evidence to support the ALJ's conclusions. *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (ALJ did not err in placing "great weight" on opinion

of consulting physician who examined plaintiff twice and provided a function-by-function opinion as to his job-related limitations).

The ALJ's obligation to assemble the claimant's medical records, although robust, "is not unlimited." *Myers ex rel. C.N. v. Astrue*, 993 F. Supp. 2d 156, 163 (N.D.N.Y. 2012). It is the claimant's obligation, both in her application materials and throughout the pendency of her case, to "inform [the agency] about or submit all evidence known to you that relates to whether or not you are blind or disabled." 20 C.F.R. § 404.1512. "This duty is ongoing and requires you to disclose any additional related evidence about which you become aware." *Id.* Once the relevant providers are identified, the ALJ is required "only to ensure that the record contains sufficient evidence to make a determination." *Johnson v. Comm'r of Soc. Sec.*, 2018 WL 3650162, at *13 (S.D.N.Y. July 31, 2018) (quoting *Bussi v. Barnhart*, 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003)), *aff'd sub nom. Johnson v. Comm'r of Soc. Sec. Admin.*, 776 F. App'x 744 (2d Cir. 2019). *See also Tankisi*, 521 F. App'x at 34 (the ALJ's determination may be upheld where the record "contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity" and is "adequate to permit an informed finding"); *Sanchez v. Colvin*, 2015 WL 736102, at *7 (S.D.N.Y. Feb. 20, 2015) (the record must be "robust enough to enable a meaningful assessment of the particular conditions on which the petitioner claims disability") (citations omitted). Rather than gather every conceivable medical record during the relevant period, therefore, the ALJ "must obtain additional information . . . when the evidence as a whole is not complete enough for the ALJ to make a determination." *Bussi*, 2003 WL 21283448, at *8 (quoting *Perez v. Chafer*, 77 F.3d 41, 47-48 (2d Cir. 1996)).

Where the ALJ does have an obligation to further develop the record, and where (as here) the claimant is represented, "the ALJ may satisfy the duty to develop the record by relying on the

claimant's counsel to obtain additional medical documentation." *Myers ex rel. C.N. v. Astrue*, 993 F. Supp. 2d 156, 163 (N.D.N.Y. 2012); *see also Jordan v. Commissioner of Social Security*, 142 Fed. App'x 542, 543 (2d Cir. Sept. 8, 2005) (summary order) (ALJ "fulfilled his duty to develop the administrative record" where plaintiff's counsel volunteered to secure missing records from treating physician; ALJ held the record open to allow him to do so; and counsel never asked for further assistance from ALJ); *Rivera v. Commissioner of Social Sec.,* 728 F. Supp. 2d 297, 330 (S.D.N.Y. 2010) (ALJ's "request that plaintiff's attorney obtain the recent treatment records from Lincoln Hospital fulfilled his obligations with regard to developing the record"); *Martin v. Saul*, 2020 WL 5096057, at *4 (W.D.N.Y. Aug. 28, 2020) ("the ALJ fulfilled her duty to develop the record by holding the record open after the hearing to permit the submission of additional evidence"); *Pagan v. Astrue,* 2012 WL 2206886, at *8 (N.D.N.Y. June 14, 2012) (ALJ satisfied his duty to develop the record by granting counsel additional time to obtain evidence and an opportunity to request a further extension").

In this case, the Commissioner obtained records from all of the sources specifically identified by plaintiff,[18] ultimately gathering treatment notes from (among others) Dr. Kang (PCP), Dr. Judge (obstetrician), Dr. Jerschow (allergist), Dr. Goodrich (neurosurgeon), Dr. Wei (neurologist), Dr. Mullin (neurologist), Dr. Monderer (sleep specialist), Dr. Park (otorhinolaryngologist), Dr. Barghava (pulmonary surgeon), Dr. Schreiber (bariatric surgeon), Dr. Hankerson (psychiatrist) and Dr. Wiedershine (psychiatrist), as well as from social worker Brandenberger and nutritionist Cordova. Additionally, ALJ Dutton considered a detailed

---

[18] Plaintiff listed various medical providers – all at Montefiore – in her initial application (R. 82-83, 92-93, 237, 272-75). She listed others in an undated follow-up form reporting her 2017 lung surgery. (R. 308.)

assessment from Dr. Torres-Acosta at Fedcap and opinion evidence from consultative examiner Dr. Archbald, who took plaintiff's medical history and personally examined her twice.[19] At the hearing, plaintiff's legal representative assured the ALJ that "we have enough information" to proceed. (R. 51.) Nonetheless, after the hearing, the ALJ held the record open for plaintiff to submit "anything else that bolsters your case" (R. 75), including records relating to her bariatric surgery (R. 51), any additional psychotherapy notes (R. 52), and "an opinion from [plaintiff's] treating doctor" as to "any permanent restrictions." (R. 75.) In response, plaintiff submitted 23 pages of medical records (R. 807-29), including the June 15, 2018 opinion letter from Dr. Kang. After carefully considering plaintiff's arguments as to why these efforts were insufficient, the Court concludes that the ALJ did not commit any error requiring remand.

### 1.    Mental Impairments

Plaintiff first argues that there are gaps in the record as to her mental health treatment. Pl. Mem. at 16-19. It is true that the record does not contain Mr. Brandenberger's notes from her first four therapy appointments in June, July, August, and September 2016, Pl. Mem. at 17, nor Dr. Hankerson's notes from December 2016. However, each of the early therapy visits is summarized (including plaintiff's scores on screening tests for depression and anxiety) in Mr. Brandenberger's detailed notes from the sessions in November 2016, January 2017, and February 2017. It is also true that the February 2017 visit is described as "7 of 10." (R. 473.) However, this does not necessarily mean that "notes from sessions . . . eight through ten are missing." Pl. Mem. at 17. Plaintiff may not have completed the series, particularly since (consistent with Dr. Hankerson's

---

[19] Plaintiff describes Dr. Archbald both as a "neurologist," *see* Pl. Mem. at 7, and "a preventative medicine doctor." *See* Pl. Reply Mem. (Dkt. No. 33) at 3. The parties agree that she performed two neurological examinations of plaintiff. Def. Mem. at 8, 21; Pl. Reply Mem. at 10.

note on February 10, 2017) it appears that her medications were "managed" thereafter by her PCP,[20] and she was "referred out" for therapy (R. 481), which she may or may not have pursued.[21] Consequently, "it is not at all clear that there are missing [psychotherapy] treatment notes" after March 2017. *Johnson*, 2018 WL 3650162, at \*14 (holding that the ALJ did not err by failing to obtain records of additional treatment that plaintiff "may have received for his mental conditions"); *see also Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018) (summary order) (holding that, even where plaintiff was unrepresented at his hearing, the ALJ had no obligation to pursue additional records merely because of a "theoretical possibility" that such records exist and could corroborate his arguments).

In this case, moreover, plaintiff's legal representative was invited to augment the record with additional psychotherapy notes. She did not submit any such notes, did not request an extension of time to locate them, and did not seek the ALJ's assistance in obtaining them. "Therefore, the ALJ did not err." *Christine D. v. Comm'r of Soc. Sec.*, 2021 WL 2042430, at \*5 (W.D.N.Y. May 21, 2021) (affirming denial of benefits where plaintiff's counsel identified missing records at the hearing but failed to submit them, seek an extension, or ask for a subpoena during the period during which the ALJ held the record open); *see also Jordan*, 142 Fed. App'x at 543;

---

[20] As has frequently been noted in the popular press, "the use of antidepressants" is "often managed by primary care physicians." Elaine K. Howley, *5 Questions to Ask Your Doctor Before Starting Antidepressants*, U.S. News & World Rpt. (Aug. 3, 2018), *available at* https://health.usnews.com/health-care/patient-advice/articles/2018-08-03/5-questions-to-ask-your-doctor-before-starting-antidepressants.

[21] On May 4, 2017, plaintiff told Dr. Kang that she had missed an appointment at New York Psychotherapy but planned to attend therapy appointments in the future. (R. 436.) The record is silent as to whether she actually returned to New York Psychotherapy for treatment.

*Meyers*, 993 F. Supp. at 163; *Rivera*, 728 F. Supp.2d at 330; *Martin*, 2020 WL 5096057, at *4;

*Pagan*, 2012 WL 2206886, at *8.[22]

Plaintiff also fails, in her briefs, to explain – other than in conclusory terms – how the

missing notes would add meaningfully to the information before the ALJ with regard to plaintiff's

mental impairments. *See* Pl. Reply Mem. at 8 ("had [the ALJ] properly discharged her duty to

complete the record, the RFC she created would more likely have accounted [for] Ms. Clarke's

already-documental mental health limitations"). This, too, undermines her argument that remand

is required. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 799 (2d Cir. 2013) (where appellant

"identifies no specific record that was missing, much less explains how it would have affected her

case," her argument that the ALJ erred in failing to supplement the record is "baseless"). The Court

therefore concludes that the information before the ALJ – including plaintiff's own statements,

treatment notes from two psychiatrists and a licensed social worker, a lengthy Fedcap assessment

including an analysis of plaintiff's "emotional limitation," and the results of numerous mental

---

[22] In her briefs, plaintiff argues the ALJ erred by "discouraging" plaintiff from submitting any
additional mental health records and "dismiss[ing] their importance." Pl. Mem. at 17-18; Pl. Reply
Mem. at 7. The hearing transcript does not bear out that characterization. It was ALJ Dutton who
initiated the discussion of the missing mental health records and brought the potential gap to the
attention of plaintiff's representative. (R. 51-52.) Although the ALJ noted – correctly – that no
mental impairment had been identified at the administrative level, she nonetheless invited Ms.
Emile to submit additional psychological treatment records if "you think that's relevant." (R. 52.)
She also offered, unasked, to hold the record open for an additional two weeks for that purpose.
(R. 51, 77.) Nothing more was required. Nor is ALJ Dutton to blame if – as plaintiff now contends
– Ms. Emile, having been recently appointed, was not yet "entirely familiar with all of Ms. Clarke's
condition," Pl. Mem. at 18, and therefore misspoke when she stated that "[plaintiff's] medication
is working" and that her "main problem" was her "medical condition." (R. 52.) As the Supreme
Court noted, in a different context, "[i]t is not unreasonable to require the claimant, who is in a
better position to provide information about his own medical condition, to do so." *Bowen v.
Yuckert*, 482 U.S. 137, 146 n.5 (1987). Plaintiff does not point to any authority – and this Court
has found none – suggesting that the ALJ's duty to develop the record required her to (i) intuit that
Ms. Emile misunderstood her client's case and (ii) insist that Ms. Emile submit additional
psychological treatment records whether or not she believed they would strengthen plaintiff's case.

status exams administered to plaintiff by other medical professionals – were "adequate to permit an informed finding" as to her mental health impairments. *Tankisi*, 521 F. App'x at 34. *See also Jachowdik v. Comm'r of Soc. Sec.*, 2021 WL 1894573, at \*8-10 (E.D.N.Y. Mar. 22, 2021) (upholding denial of benefits where, "[e]ven if the ALJ did fail to fully develop the record," plaintiff failed to establish that the failure caused him "prejudice"), *report and recommendation adopted,* 2021 WL 1890018 (E.D.N.Y. May 11, 2021); *Gonzalez v. Comm'r of Soc. Sec.*, 2018 WL 4054866, at \*13 (S.D.N.Y. Aug. 24, 2018) ("Plaintiff's counsel has not identified any evidence that suggests that more recent treatment notes from Dr. D'Allegro or LMSW Rosado would materially alter the ALJ's analysis. Accordingly, the Court finds that the ALJ satisfied her duty to develop the record."); *Johnson*, 2018 WL 3650162, at \*14-15 (upholding denial of benefits where ALJ's failure to pursue additional mental health records was "inconsequential" in light of materials already in the file and it was "unlikely" that such records "would have changed the ALJ's conclusions about Johnson's mental impairments.").

### 2.    Physical Impairments

With regard to her physical impairments, plaintiff contends that the ALJ failed to obtain complete records from Dr. Kang, Dr. Goodrich, and the Montefiore Headache Center, Pl. Mem. at 21; Pl. Reply Mem. at 8-10, and that she further erred by failing to seek "clarification" of Dr. Kang's June 15, 2018 letter. Pl. Mem. at 21-22; Pl. Reply Mem. at 10-11. As to Dr. Kang, plaintiff reasons that since she was plaintiff's PCP, as well as the doctor who would not "clear" plaintiff to "go back to work," Pl. Mem. at 19, plaintiff must have continued seeing her after May 4, 2017, and therefore that progress notes "from over a year of treatment" by Dr. Kang are "absent from the record." *Id*. However, the letter that Dr. Kang wrote on June 15, 2018 – after the ALJ specifically asked for her opinion about plaintiff's "permanent restrictions" and "anything else that bolsters your case" (R. 75) – said nothing about whether or how frequently she had seen plaintiff in the

past year (and nothing about permanent restrictions). On this record, the Court is not persuaded that Dr. Kang had any additional notes to produce, *see Johnson*, 2018 WL 3650162, at *14, much less that there was a "blatant lack" of medical documentation, Pl. Reply Mem. at 9, or an "obvious gap" in the record, so as to trigger the ALJ's obligation to develop it further. *See Eusepi v. Colvin*, 595 Fed. App'x 7, 9 (2d Cir. 2014) (citation omitted) ("[T]he agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record.").

Plaintiff is on less speculative ground when she points out that the administrative record does not include Dr. Goodrich's notes – which almost certainly exist – from plaintiff's shunt surgery in July 2014. Pl. Mem. at 20. However, that surgery took place more than 12 months prior to her application for benefits in March 2016, beyond the mandatory reach of 20 C.F.R. § 404.1512(b)(1). Moreover, according to plaintiff, the placement of the shunt resulted in an *improvement* of her headaches (which began in 2014 but did not prevent her from working at any time that year) that lasted until the birth of her third child in December 2015, after which they returned, "worse than before." (R. 257.) Given these facts, it is not obvious to the Court – and plaintiff nowhere explains – how the 2014 neurosurgical records would bear on the severity of her headache symptoms from December 20, 2015 through the date of the hearing. *See Reices-Colon*, 523 F. App'x at 799; *Dutcher v. Astrue*, 2011 WL 1097860, at *5 (N.D.N.Y. Mar. 7, 2011) ("Plaintiff cannot simply identify arguable gaps in the administrative record and claim that these gaps are a *per se* basis for remand.").

Plaintiff believes that the record is also missing Dr. Goodrich's notes from checkups on February 11, 2016 (because Dr. Kang noted on that date that plaintiff "saw NS" and was "informed to see if [patient] improves for about one month") (R. 343); December 2016 (because Dr. Wei noted on March 21, 2017 that plaintiff last saw Dr. Goodrich in December 2016) (R. 417); and,

possibly, on an unspecified date thereafter (because plaintiff testified at the hearing that "my neurosurgeon, he's told me to just lay flat down when I get the headaches") (R. 62). *See* Pl. Mem. at 20. The Court is not convinced that all of these records exist.[23] Assuming they do, however, their absence does not render the administrative record insufficient to "enable a meaningful assessment of the particular conditions on which the petitioner claims disability," including – as relevant here – chronic headache pain. *Sanchez*, 2015 WL 736102, at *7.

Although plaintiff's headaches (along with her papilledema) were originally thought to be caused by her PTC – which was relieved by the shunt – the headaches returned after the birth of plaintiff's third child in the *absence* of either high intercranial pressure or papilledema, causing plaintiff's PCP to look at "other reasons of her HA" (R. 403), for which she referred plaintiff to other providers, including Drs. Wei and Mullin in the Headache Center and Dr. Monderer in the Sleep-Wake Disorders Center. Notes from all these doctors are in the administrative record (R. 416-22, 432-35, 457-59, 808-14), as are the complete results of plaintiff's December 21, 2016 sleep study. (R. 515-23.) Plaintiff offers the Court no reason to conclude that additional records from the surgeon who operated on her in 2014 would "materially alter the ALJ's analysis" as to her ability to work several years later. *Gonzalez*, 2018 WL 4054866, at 13. Nor has plaintiff shown that she received more "extensive treatment" at the Headache Center than the administrative record reflects. Pl. Mem. at 21.

---

[23] Dr. Kang's casual note that plaintiff "saw NS" may or may not mean that she saw Dr. Goodrich, much less that she saw him on the same day she saw Dr. Kang. Similarly, Dr. Wei's note concerning plaintiff's last visit with Dr. Goodrich may or may not be accurate. The Court further notes that plaintiff *first* reported that Dr. Goodrich told her to lie flat when she had a headache in her Function Report on April 11, 2016. (R. 259.) It is not clear from her hearing testimony whether she was reporting old advice or a newer recommendation.

It bears repeating, in this regard, that the ALJ asked plaintiff's representative about potentially missing records, directed her to submit "anything else that bolsters your case" (R. 75), and held the record open, after the hearing, for this purpose. After failing to submit any additional treating records from Dr. Kang, Dr. Goodrich, or the Headache Center, it ill behooves plaintiff to claim now – for the first time – that remand is required due to the "blatant lack of records" before the ALJ. "Accordingly, the Court finds that the ALJ satisfied her duty to develop the record." *Gonzalez*, 2018 WL 4054866, at 13; *see also Martin*, 2020 WL 5096057, at *4.

### 3.   Clarification

The ALJ further erred, according to plaintiff, by failing to seek "clarification" from Dr. Kang regarding "plaintiff's long term functional restrictions and specific limitations." Pl. Mem. at 22. Citing *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010), plaintiff asserts that a clarification request is required where a treating physician's report is "insufficiently explained, lacking in support, or inconsistent with the physician's other reports." Pl. Mem. at 21. *Calzada*, however, relied upon 20 C.F.R. § 404.1512(e)(1) (2006) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved [or] the report does not contain all the necessary information"), which was amended in 2012 "to *remove* former paragraph (e) and the duty it imposed on ALJs to re-contact a disability claimant's treating physician under certain circumstances." *Lowry v. Astrue*, 474 F. App'x 801, 805 n.2 (2d Cir. 2012) (emphasis added); *see also Mena v. Comm'r of Soc. Sec.*, 2021 WL 1222150, at *16 (S.D.N.Y. Mar. 31, 2021) ("this argument relies upon an inaccurate or outdated reading of the regulations."). The Commissioner is correct that under the regulatory scheme applicable to the present case, an adjudicator "may elect to recontact a treating source to obtain additional information or clarification," Def. Mem. at 23,

but "is not obligated to do so." *Id.*; *see* 20 C.F.R. § 404.1520b(b)(2)(i) ("We may contact your medical source.").

Moreover, the question in *Calzada* was whether the ALJ was required to seek clarification before "dismissing" treating physician reports which, if fully credited, would have *supported* the claimant's application for benefits. 753 F. Supp. at 277-78. Here, although ALJ Dutton specifically asked plaintiff's representative to obtain (if possible) an opinion as to her "permanent restrictions" (R. 76), Dr. Kang's June 15, 2018 letter did not state – even in general terms – that any such restrictions existed. (R. 807.) To the contrary: it informed the Commissioner that plaintiff was undergoing a "medical evaluation and treatment" with an "anticipated end date" of 6 months." (*Id.*) Thus, ALJ Dutton did not dismiss Dr. Kang's letter because it was "insufficiently explained, lacking in support, or inconsistent with the physician's other reports," Pl. Mem. at 21; she gave it "little" weight because it did not "address any long-term functional restrictions" or "provide specific limitations regarding the claimant's functioning." (R. 26.) Under these circumstances, the ALJ had no obligation to seek, from the same physician, a more favorable opinion.

**B.    Substantial Evidence Supported the ALJ's RFC Determination**

A claimant's RFC is the most she can do despite her limitations. 20 C.F.R. § 404.1545(a)(1); *see also* SSR 96-8p, 1996 WL 374184, at *4 (S.S.A. July 2, 1996). The ALJ must assess the claimant's RFC based on all the relevant medical and other evidence of record, taking into consideration the limiting effects of all the claimant's impairments, "even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *2, 5. The relevant evidence includes the claimant's medical history, reports of the claimant's daily activities, medical source statements, and "effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment," among other things. *Id.* at *5. Here, the ALJ determined that plaintiff is capable of light work with additional postural and environmental limitations, including a sit-

34

stand option (that is, the ability "to change position periodically due to pain or discomfort"); only occasional climbing, balancing, stooping, kneeling, crouching and crawling; no work on ladders, no "concentrated exposure" to cold, heat, wetness, humidity, and hazards; no "excessively noisy backgrounds"; and no exposure (even "moderate exposure") to fumes, odors, or gasses. (R. 21.)

Plaintiff argues that the evidence of record "demonstrates more restrictions than were accounted for by ALJ Dunn in her assessment of Ms. Clark's residual functional capacity." Pl. Mem. at 23. Regarding her mental health conditions, plaintiff challenges the ALJ's finding, at step two, that these impairments were "non-severe," *id*. at 24-25, pointing to her hearing testimony that her panic attacks and anxiety prevented her from traveling by train (or by bus "if it was too crowded"), which in and of itself "presents a significant limitation on her ability to perform work." *Id*. (quoting *Lewis v. Astrue*, 2013 WL 5834466, at *22 (S.D.N.Y. Oct. 30, 2013)). Additionally, plaintiff relies on Dr. Wiedershine's report that plaintiff was experiencing "psychotic symptoms frequently," Dr. Archbald's note that plaintiff needed "ongoing mental health services," and Dr. Torres-Acosta's opinion that she "needed a low stress environment with the opportunity to take breaks as needed." *Id*. Regarding her physical impairments, plaintiff argues that her headaches were more disabling than the ALJ acknowledged, and that although the ALJ properly accounted for plaintiff's sensitivity to sound, "she did not account for Ms. Clarke's sensitivity to light at all." *Id*. at 25. Consequently, plaintiff argues, the RFC formulated by the ALJ was not supported by substantial evidence. Having carefully reviewed the record in its entirety, the Court disagrees.

At the time she applied for benefits, plaintiff specifically denied "any psychiatric problems." (R. 84.) Thereafter, beginning in mid-2016, she was diagnosed with anxiety and

depression,[24] for which she was treated conservatively, with therapy and medication. According to both Dr. Hankerson and Dr. Wiedershine, she did not always take her antidepressant medication as prescribed. (R. 479, 511.) The ALJ also acknowledged Dr. Wiedershine's diagnosis, made in 2017, of bipolar I disorder. (R.18.) Significantly, however, Dr. Wiedershine is the only mental health professional to have made this diagnosis, which he did on the basis of a single session with plaintiff, after describing a constellation of long-standing psychotic symptoms (including mood swings, paranoia, and auditory and visual hallucinations) that no other treating or examining source observed and that plaintiff never reported to the SSA, never revealed to any other physician or therapist, and never testified about at the hearing.[25]

As the ALJ correctly observed, all of plaintiff's other treating and examining medical sources "observed generally normal or only limited psychiatric abnormalities upon examination" (R. 18), including generally unremarkable mental status exams. (*See*, *e.g.*, R. 353, 430, 453-54,

---

[24] "Anxiety disorders are the most common of mental disorders and affect nearly 30% of adults at some point in their lives. But anxiety disorders are treatable and a number of effective treatments are available. Treatment helps most people lead normal productive lives." American Psychiatric Association, *Anxiety Disorders*, https://www.psychiatry.org/patients-families/anxiety-disorders/what-are-anxiety-disorders. Similarly, "[d]epression affects an estimated one in 15 adults (6.7%) in any given year. And one in six people (16.6%) will experience depression at some time in their life." American Psychiatric Association, *What Is Depression?*, https://www.psychiatry.org/patients-families/depression/what-is-depression. Although it can be serious, "Depression is among the most treatable of mental disorders. Between 80% and 90% percent of people with depression eventually respond well to treatment. Almost all patients gain some relief from their symptoms." *Id*.

[25] To the contrary: plaintiff denied "hearing voices" or "seeing things" during her intake interview at Fedcap (R. 368, 374) and her consultative examination with Dr. Archbald, who found "no evidence of delusions or hallucinations." (R. 353.) Similarly, at Montefiore, plaintiff repeatedly denied any hallucinations when speaking with her therapist, Mr. Brandenberger (R. 476, 477, 509), and her psychiatrist, Dr. Hankerson (R. 480), who also noted that plaintiff displayed "no other psychotic symptoms." (*Id*.) Oddly, Dr. Wiedershine seems to have been unaware that plaintiff received mental health treatment at Montefiore, writing that "RT has not yet seen a therapist outside of NYPCC." (R. 511.)

468, 475-76, 480, 502, 528.) The ALJ is also correct that plaintiff has never required emergency mental health treatment or inpatient psychiatric hospitalization. (R. 19.) Moreover, while plaintiff told the ALJ at the hearing that she "can't even get on the bus if it's too crowded" or if she has "a panic attack" (R. 56), she previously denied experiencing panic attacks in interviews with treating sources, including Dr. Wiedershine. (R. 479, 480, 511.)

On this record, the Court cannot conclude that the ALJ erred in finding plaintiff's psychiatric impairments non-severe at step two.[26] Nor was the ALJ required to incorporate additional limitations into plaintiff's RFC to account for those non-severe impairments. The only physician who recommended such limitations was Dr. Torres-Acosta, who saw plaintiff once, in 2016, and wrote, somewhat vaguely, that she had "emotional" limitations relating to "[t]olerating stress, adapting to change, [and] regulating emotions/mood," requiring a "low stress" job. (R. 393.)

---

[26] Under the applicable regulations, a "severe" impairment is an impairment that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 CFR § 404.1520(c); *see also Bowen*, 482 U.S. at 153; *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). To determine whether a mental impairment (or combination of impairments) is severe, the ALJ is required to rate the degree of functional limitation resulting from the impairment(s) across four broad functional areas: (1) understanding, remembering, and applying information, (2) interacting with others, (3) concentrating, persisting, and maintaining pace, and (4) adapting and managing oneself. 20 C.F.R. § 404.1520a(c)(3). The degree of limitation in each area is rated on a five-point scale: "none, mild, moderate, marked, [or] extreme." *Id*. § 404.520a(c)(4). "If a claimant has no more than mild limitations in the four broad functional areas, then the ALJ will generally conclude that the mental impairment, or combination of impairments, is non-severe." *George A. v. Comm'r of Soc. Sec.*, 2021 WL 2102527, at *3 (W.D.N.Y. May 25, 2021); *see also* 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."). Here, the ALJ separately analyzed each of the four functional areas and found that as a result of her mental health conditions plaintiff had "a mild limitation" as to the first and third, and "no limitation" as to the second and the fourth. (R. 19-20.) Plaintiff does not specifically challenge the ALJ's finding as to any of the four functional areas, much less make a cogent argument that she was "moderately," "markedly," or "severely" limited as to any one of them. Plaintiff has therefore failed to identify any basis on which this Court could reject the ALJ's step two findings.

As the ALJ correctly observed, Dr. Torres-Acosta's opinion is "not consistent with the evidence as a whole." (R. 27.) Among other things, plaintiff herself wrote, in her Function Report, "I deal with stress okay," adding that, although she did not like change much, "I deal with it fine." (R. 257.)[27] Dr. Archbald, who examined plaintiff twice, wrote after her second examination in 2017 that plaintiff "needs ongoing mental health services" (R. 530), but did not assess any related functional limitations. And Dr. Kang, plaintiff's PCP, did not even mention her psychological impairments when opining, in 2018, that plaintiff needed "short-term disability" for six months while she underwent evaluation and treatment for her headaches. (R. 807.) In short, nothing in the record compelled the ALJ to incorporate additional limitations, related to plaintiff's mental impairments, into her RFC.

The same is true with respect to plaintiff's physical impairments. It is simply not the case that plaintiff's headache symptoms were "not accounted for in the residual functional capacity" analysis, Pl. Mem. at 25, which limited plaintiff to light work, with no climbing ladders, and no exposure to "excessively noisy backgrounds." (R. 21.) It is true that the ALJ's RFC does not include any limitations specifically designed to account for plaintiff's "sensitivity to light." Pl. Mem. at 25.) However, the evidence regarding that sensitivity is both sparse and uneven.[28]

More generally, the evidence as to the severity of plaintiff's headaches is mixed. It is true, as plaintiff notes, that she sought treatment for her headache pain from several different providers,

---

[27] Plaintiff's friend Ferenicia Brown, who submitted a third-party Function Report, confirmed this assessment, writing that plaintiff "handles stress OK" and "can handle changes well." (R. 268.)

[28] In her April 2016 Function Report, plaintiff reported sensitivity to both sound and lights. (R. 260.) During her March 2017 appointment with Dr. Wei at the Headache Center, she reported daily headaches "associated with photo/phonophobia." (R. 417.) Then, at the June 2018 hearing, plaintiff testified, "I can't sit at the computer too long, because it bothers my eyes, and my head aches." (R. 59.) However, during her appointment with Dr. Wei, plaintiff "denied any visual complaints with the [headache]." (R. 417.) Plaintiff also reported that she kept in touch with friends and family via "video chat" (R. 254, 266), with no mention of any eye problems or headache exacerbation.

including Drs. Wei and Mullin at the Headache Center and Dr. Monderer at the Sleep-Wake Disorders Center. *See* Pl. Reply Mem. at 4-5. However, at the time of her hearing, she was not taking any pain medication. (R. 61-62, 64.) She explained that she was unable to take Motrin after her bariatric surgery (*id.*), but she did not address why she was not taking Tylenol Extra Strength, which was prescribed for that purpose after the surgery. (R. 813-14.) She did explain why she was not taking Topamax: "I don't get seizures, so I didn't take the chance in taking it." (R. 64.) However, plaintiff was prescribed Topamax for headache pain, not seizures. (R. 417, 421.) On this record, as the ALJ noted (R. 23), plaintiff's decision to forgo any medication at all was inconsistent with her claims of frequent and disabling headache pain. Moreover, although plaintiff testified that she had three to four "really bad" headaches every day (R. 61, 64), she was not in any "acute distress" at any of the dozens of medical appointments and examinations documented in the administrative record. (*See*, *e.g.*, R. 332, 343, 403, 417, 463, 754, 810.) Nor is there any suggestion, in the record, that she had to cancel appointments due to migraines. As the ALJ correctly noted (R. 25), plaintiff was able to perform a wide range of daily activities – albeit with some assistance – and none of her treating or examining sources identified any specific, work-related functional limitations resulting from her headaches.

"[I]t is the ALJ's prerogative to make an RFC assessment after weighing the evidence and the District Court may not reverse provided there is substantial evidence in the record to support her findings." *Moronta v. Comm'r of Soc. Sec.*, 2019 WL 4805801, at *19 (S.D.N.Y. Sept. 30, 2019) (quoting *Mitchell v. Astrue*, 2010 WL 3070094, at *5 (W.D.N.Y. Aug. 4, 2010)). "If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." *Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008). In this case – as in most

cases – there is some evidence in the record that would support the conclusion that plaintiff had greater limitations than those the ALJ incorporated into her RFC determination. But there is also substantial evidence supporting the ALJ's determination. Consequently, the Court is required, under the "very deferential standard of review" that applies to ALJ fact-finding, to accept that determination. *Brault*, 683 F.3d at 448.

## VI.    CONCLUSION

For the foregoing reasons, plaintiff's motion is DENIED, the Commissioner's motion is GRANTED, and this action is DISMISSED.

Dated: New York, New York
        June 16, 2021

**SO ORDERED.**

_____
**BARBARA MOSES**
**United States Magistrate Judge**